**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI CENTRAL DIVISION**

| | | |
|---|---|---|
| TONY D. BICKERS,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,[1]<br>Commissioner of Social Security,<br><br>Defendant. | ) | No. 2:12-4144-DGK-SSA |

**ORDER REMANDING CASE TO COMMISSIONER FOR FURTHER PROCEEDINGS**

Plaintiff Tony Bickers ("Bickers") seeks judicial review of the Commissioner of Social Security's denial of his applications for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, *et. seq.*, and supplemental security income ("SSI") based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et. seq*. The Administrative Law Judge ("ALJ") found that Bickers suffers from affective mood disorders and anxiety disorders but retains the residual functional capacity ("RFC") to perform past relevant work as a convenience store clerk, general production worker, and production line welder. In making his RFC determination, the ALJ discounted the opinion of Plaintiff's treating psychiatrist. Because the ALJ erred in discounting the psychiatrist's opinion, this case is remanded to the Commissioner for additional proceedings consistent with this decision.

**Factual and Procedural Background**

The medical record is summarized in the parties' briefs and is repeated here only to the extent necessary.

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted for Michael J. Astrue as the defendant in this suit.

Plaintiff filed his application for disability insurance benefits and SSI benefits on April 19, 2010, alleging a disability onset date of February 28, 2010. The Commissioner denied his applications at the initial claim level, and Plaintiff appealed the denial to an ALJ. On February 4, 2011, the ALJ issued her decision finding Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the Commissioner's final decision. Plaintiff has exhausted all of his administrative remedies and judicial review is now appropriate under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

**Standard of Review**

A federal court's review of the Commissioner of Social Security's decision to deny disability benefits is limited to determining whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough evidence that a reasonable mind would find it sufficient to support the Commissioner's conclusion. *Id.* In making this assessment, the court considers evidence that detracts from the Commissioner's decision, as well as evidence that supports it. *Id.* The court may not reverse the Commissioner's decision as long as substantial evidence in the records supports this decision, even if substantial evidence in the record also supports a different result, or if the court might have decided the case differently were it the initial finder of fact. *Id.*

**Analysis**

In determining whether a claimant is disabled, that is, unable to engage in any substantial gainful activity by reason of a medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than twelve months, 42 U.S.C. § 423(d), the

Commissioner follows a five-step sequential evaluation process.[2] Plaintiff contends the ALJ erred at step four in determining his RFC by discounting the opinion of his treating psychiatrist, Dr. Albert Shaw, M.D.

It is well-established that,

> [a] treating physician's opinion is generally entitled to substantial weight; however, such an opinion does not automatically control in the face of other credible evidence on the record that detracts from that opinion. Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence. When deciding how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations. When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.

*Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (internal quotations and citations omitted). In the present case, the ALJ found Dr. Shaw's opinion was inconsistent with the record as a whole, specifically Plaintiff's own reports and a questionnaire completed by his ex-employer. R. at 28. The Court finds Dr. Shaw's testimony is consistent with the existing record, Plaintiff's own testimony, and the ex-employer's questionnaire. Thus, the ALJ did not establish a sufficient basis for discounting Dr. Shaw's opinion and this case must be remanded.

Dr. Shaw summarized his opinion in the following letter:

---

[2] The five-step process is as follows: First, the Commissioner determines if the applicant is currently engaged in substantial gainful activity. If so, he is not disabled; if not, the inquiry continues. At step two the Commissioner determines if the applicant has a "severe medically determinable physical or mental impairment" or a combination of impairments. If so, and they meet the durational requirement of having lasted or being expected to last for a continuous 12-month period, the inquiry continues; if not, the applicant is considered not disabled. At step three the Commissioner considers whether the impairment is one of specific listing of impairments in Appendix 1 of 20 C.F.R. § 404.1520. If so, the applicant is considered disabled; if not, the inquiry continues. At step four the Commissioner considers if the applicant's residual functional capacity ("RFC") allows the applicant to perform past relevant work. If so, the applicant is not disabled; if not, the inquiry continues. At step five the Commissioner considers whether, in light of the applicant's age, education and work experience, the applicant can perform any other kind of work. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009). Through step four of the analysis the claimant bears the burden of showing that he is disabled. After the analysis reaches step five, the burden shifts to the Commissioner to show that there are other jobs in the economy that the claimant can perform. *King*, 564 F.3d at 979 n.2.

> Tony Bickers is a patient of mine at Burrell Behavioral Health in Sedalia, MO. Before he started with Burrell in 2007, Tony was a patient of mine at the Phoenix Programs 6 month residential modified therapeutic community (MTC) in Columbia, MO. In MTC, he was observed taking his medications, had a counselor and group therapy to help deal with stress, and was routinely tested for substances (he was abstinent). Even during the 6 months that Tony was in MTC, his mood, behavior and thought process' waxed and waned.
>
> The same pattern persisted when he moved back to Sedalia, Misouri. During the 2-4 month spans that his mood is level, Tony is easy-going, humble, friendly, conscientious, and motivated. I have no doubt that if his mood could remain level, he would be a good full-time employee. Unfortunately, we have not been able to prevent his manic episodes, despite multiple trials of medications. Tony's manic symptoms include racing and disorganized thoughts, distractibility, impulsivity, hyperactivity, and grandiosity. He talks quickly and loudly, gets off on tangents quickly, and has a pressure to keep talking. During manic episodes, he is likely to become overwhelmed easily and act quickly and illogically.
>
> Some of Tony's previous employers have given him time to level back out, but it takes very little of Tony's manic behavior to alienate customers and coworkers. Due to his periods of decompensation, Tony has not been a reliable enough worker to remain employed. He is stable enough to get a full-time job and work it, but not keep it.

R. at 311.

Dr. Shaw's views are detailed in a medical assessment form titled "Medical Assessment of Ability to Do Work-Related Activities (Mental"). R. at 312. In it, Dr. Shaw describes Plaintiff's ability to make occupational, performance, and personal social adjustments. R. at 312-13. Dr. Shaw rates Plaintiff's abilities as "fair" or "poor" in each subcategory and expounds on these ratings with written comments. R. at 312-13. With respect to Plaintiff's ratings in the "occupational adjustment" category, Dr. Shaw explained that "Tony's abilities will vary greatly depending on which phase of the illness he is in. His disorder is characterized by episodes of

decompensation. At times he can function very well, but he can't function long enough to keep a steady job or have a career." R. at 312. With respect to Plaintiff's ability to make performance adjustments, Dr. Shaw observed "[w]hen manic, Tony is too agitated, distractible, and disorganized to adjust to a job. Episodes of decompensation prevent him from adjusting to a job reliably." R. at 313. As for Plaintiff's ability to make personal social adjustments, Dr. Shaw noted, "[d]uring a manic episode, Tony is impulsive, distractible, agitated, emotionally unstable, and overwhelmed quickly by routine job requirements." R. at 313. When the ratings are viewed alongside the written comments, it is clear that Dr. Shaw's ratings refer to Plaintiff's abilities when he is experiencing a manic phase. Dr. Shaw's opinion is consistent with Plaintiff's treatment notes from Burrell Behavioral Health. R. at 257-95.

Dr. Shaw's opinion is also consistent with the observations of another treating psychiatrist, Dr. Bhaskar Y. Gowda, M.D. Dr. Gowda evaluated Plaintiff in November 2007 at a psychiatric hospital following Plaintiff's second or third suicide attempt.[3] Dr. Gowda made the following assessment:

> HISTORY OF PRESENTING ILLNESS
>
> The patient is a 35-year-old Caucasian male with a long history of Bipolar Disorder and alcohol dependence.[4] He has been followed up at Burrell with a nurse practitioner. He had been on Depakote, Seroquel, Prazosin, and Ativan. His girlfriend with whom he lives also has Bipoloar Disorder and advised him not to take those medications for almost a month. He gradually decompensated . . . . He was on the go all the time and was not sleeping well. He also started having severe racing thoughts and he has been losing weight. He lost about 25 pounds in the last month. He started feeling depressed, hopeless, and helpless.
>
> *  *  *

---

[3] The record is unclear as to exactly how many times Plaintiff previously attempted to kill himself.

[4] There is no dispute that Plaintiff has been drug and alcohol free since April 2007, when he entered a dual diagnosis drug treatment program.

According to patient, he has been having severe mood swings and he feels Depakote and Seroquel are not helping him anymore. They made him too groggy and he was running into walls and having dizzy spills. He had good luck with Abilify in the past. He remained stable for almost six to seven months on Abilify, Paxil, and Xanax in combination. His medication has been changed several times and he feels this current regime is not working well.

The patient also reports having severe nightmares about his mom beating him until he fell unconscious on several occasions. He still gets nightmares and wakes up in a cold sweat. Mom was hitting him as early as 4 or 5 years old. He feels anxious and edgy all the time. He had severe panic attacks on a regular basis. He feels Prazonsin and Ativan are helping him with his anxiety symptoms.

* * *

PAST PSYCHIATRIC HISTORY

The patient has a long history of Bipolar Disorder. His psychiatric problems started in 1997 after his divorce. He attempted suicide by driving [a] car into a pole. He escaped that attempt and he was treated for severe depression and later he was diagnosed with Severe Depression and Generalized Anxiety Disorder. He also overdosed in 2000. Later he was admitted several times with cutting his wrists. He has been diagnosed with Bipolar Affective Disorder Type II and Posttraumatic Stress Disorder (PTSD). He has been in and out of treatment programs for several years and he has been treated for PTSD previously at outpatient psychiatric care with Glenna Burton. The patient denied having any auditory or visual hallucinations.

* * *

> PERSONAL AND DEVELOPMENTAL HISTORY
>
> The patient had been working as a welder until last year. Now he is not able to work because of his Bipolar Disorder . . . .
>
> . . . He grew up in a very dysfunctional family. Mom had severe Bipolar Disorder and alcohol problems. Dad was an alcoholic and died [from] alcohol complications when patient was very young. Stepdad was also an alcoholic. The lived off of his dad's social security benefits and mom was also on disability. He had a very chaotic early childhood because his mom was beating him all the time and his stepdad joined with that. He had average to poor grades and he was always a shy kid and very timid. He dropped out in tenth grade so that he could get out of his house and also work. He had been a welder all his life and he was married for almost seven years and his life fell apart after his divorce in 1997. He has been in and out of treatment programs because of his alcohol problems. He has been in and out of psychiatric hospitals since then. The patient has a long history of self-mutilating behavior ever since 1997.
>
> FAMILY HISTORY
>
> His biological father was an alcoholic. Biological mom had Bipolar Disorder and was an alcoholic. Three brothers and three sisters all have alcohol problems and one sister and one brother have Bipolar Disorder.

R. at 240-42.

Dr. Shaw's opinion is also consistent with the observations of Plaintiff's social worker, Peggy Williams, MSW, QMHP, CSS. Ms. Williams noted that Plaintiff was not malingering and wanted to work, but that when he is manic he may make impulsive decisions. She wrote,

> Tony did make efforts to work prior to securing the job at Casey's in October, 2008. He secured employment welding in September, 2008 and lasted approximately four days. He would come home from that job so anxious and so wrung out from worrying about his performance, that he often could not sleep and had tearful bouts. After four days of this, he opted to quit as he could not take the strain. This did not deter him from continuing to look for work and I supported that.

> Tony started work at Casey's . . . in October, 2008. He secured the job at Casey's and was excited about finding something so quickly and worried at the same time about whether he would be able to handle the strain of working with the public. His immediate boss, Janet, who knew Tony from other places, was aware that there were some mental health issues, assured him that she would work with him. I reread my file notes, and Tony did do well at the job. He surprised himself by being able to be more social and outspoken with the customers, greeting them as they entered the store, engaging with them as they were checking out and handling other situations that arose. He also learned to deal with the other employees and their difficulties. He did struggle with having to make comments regarding attendance, or performance, but for the most part he did it. He got great reviews. However, looking back over my notes, there were times when extra support was needed and medication changes were made to assist him in being able to continue work. Working affected his ability to sleep. It also affected his anxiety levels. He would begin worrying about being able to handle the responsibility of being the fill in manager, as soon as the manager would let him know when she planned to take off. I am not talking just days of worry, but weeks. He would obsess about the what if's until he would almost have himself talked into his not being able to perform. I have notes where Tony would come to appointments and tell me that his boss was mentioning to him that he seemed a little withdrawn, or not as happy as he had been, or too quick to respond in a snappy fashion, or more energetic than normal. During one of his manic phases while he worked there, he cleaned and restocked all the front shelves. When Tony was symptomatic in that way, the business benefitted greatly from his inability to stand still.
>
> I am offering the preceding information to say that Tony, even when symptomatic, made every effort to maintain his job. . . . I did not see him until after he had quit the job, but I was not surprised to learn that he had. When Tony is symptomatic, especially manic, he can make impulsive decisions.

R. at 213-14.

The Court also finds Dr. Shaw's testimony is consistent with Plaintiff's own reports and the ex-employer questionnaire completed by Casey's General Store. Plaintiff reported that his work at Casey's was going well in many respects: His boss was giving him "great reviews" and

assigning him additional responsibilities, and his focus and concentration at work was "pretty good." R. at 213, 276. Additionally, Janet Jones, the Casey's General Store manager who was aware of Plaintiff's mental illness when she hired him, also gave him a positive evaluation. R. at 197-99.

These positive reviews are consistent with Dr. Shaw's opinion that despite his doctors' best attempts to adjust his medication, Plaintiff will continue to experience manic phases during which he will decompensate and be too impulsive, unstable, and unreliable to maintain full-time employment. Plaintiff's own report indicates he was decompensating in the period leading up to his last day at Casey's, that he broke down while at work, and that he suddenly walked off the job. R. at 41-42. Additionally, although Ms. Jones thought Plaintiff was a good worker, this does not alter the fact that Plaintiff quit while undergoing a manic episode.[5] It is clear from the record that medication will not completely prevent Plaintiff's manic episodes. Thus, this experience confirms Dr. Shaw's medical opinion that "[d]uring manic episodes, he is likely to become overwhelmed easily and act quickly and illogically." R. at 311. His "abilities will vary greatly depending on which phase of the illness he is in. His disorder is characterized by episodes of decompensation." R. at 312. His periods of decompensation render him unreliable. R. at 311. "He is stable enough to get a full-time job and work it, but not keep it." R. at 311.

Of course, the ALJ was not required to give any deference to Dr. Shaw's opinion concerning Plaintiff's employability. *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."). But the ALJ erred in discounting Dr. Shaw's medical opinion because his

[5] The Court notes there is no suggestion anywhere in the record or in the ALJ's credibility evaluation that Plaintiff is not motivated towork.

opinion is consistent with the record, Plaintiff's own reports of his symptoms, and Ms. Jones' evaluation.

Moreover, this error was not a mere deficiency in opinion writing technique. In his decision the ALJ found that Plaintiff could perform past relevant work as a convenience store clerk, general production worker, or production line welder. R. at 29. During Plaintiff's cross-examination of the vocational expert ("VE"), the VE testified that an inability to "use judgment," "deal with work stresses," or "demonstrate reliability" for up to two months out of the year would preclude employment in these jobs. R. at 52-53. Accordingly, this case must be remanded for additional consideration.

**Conclusion**

For the reasons discussed above, the Court REMANDS this case to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date: August 16, 2013

/s/ Greg Kays
GREG KAYS, JUDGE
UNITED STATES DISTRICT COURT